Delbert D. FURNISH, III,
Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 18A02–0203–CR–199.

Court of Appeals of Indiana.

Dec. 6, 2002.

Kelly N. Bryan, Public Defender, Muncie, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Zachary J. Stock, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Delbert Furnish ("Furnish") was convicted of Burglary, as a Class C felony, in Delaware Circuit Court. During the jury trial, Furnish objected to the admission of a statement he made to police officers before he was Mirandized. His objection was overruled. He appeals his conviction and argues that the trial court abused its discretion when it admitted the statement because he was subjected to an interrogation before he was Mirandized; therefore, his statement was unlawfully obtained.

We reverse and remand for a new trial.

### Facts and Procedural History

At approximately 4:20 a.m. on April 13, 1997, Officer Shad O'Dell ("Officer O'Dell") of the Muncie Police Department observed Furnish walking around a Save–On Liquor Store on the corner of Jackson Street and Manhattan Street in Muncie, Indiana. When he spotted Officer O'Dell, Furnish began running, and therefore, Officer O'Dell stepped out of his police car, identified himself as a police officer, and told Furnish to stop. Furnish continued running and Officer O'Dell called for assistance.

Officer Dan Jent ("Officer Jent") observed Furnish running and saw him climb over a fence. He began chasing Furnish and yelled "stop police." Tr. p. 93. Officer Jent lost sight of Furnish, but when he arrived on Biltmore Avenue, another offi-

cer yelled his name and pointed to a man sitting on the porch of a house. Officer Jent believed it was the same man he was chasing so he approached the porch of the house, spoke with him, and patted him down for officer safety. Furnish told Officer Jent that the individual he was chasing ran a different way. Officer Jent then inquired if Furnish lived at the house and Furnish replied that he did. Officer Jent then stated, "let's go back inside and have somebody else verify that you live here." Tr. p. 94. Furnish responded, "you caught me, I'm the guy you was chasing." *Id.*

Officer Jent handcuffed Furnish, placed him under arrest, and began a more thorough search incident to that arrest. During the search, he felt something in Furnish's boots and pulled out money wrapped in bank wrappers. Observing the search, Officer O'Dell, who arrived on the scene after Furnish was placed under arrest and who saw the wrapped money as Jent removed it from Furnish's boot, stated, "damn, Delbert, where'd you get all the money." Tr. pp. 75, 95. To which Furnish replied, "the Save–On." Tr. pp. 76, 96. A police officer was then sent to the Save–On Liquor Store, and when he arrived, the officer discovered that a door on the west side of the store was open about three or four inches and the wood around the lock area was splintered. Tr. p. 116. After the officer confirmed that the Save–On had been burglarized, Officer O'Dell read Furnish his Miranda rights. Tr. p. 38. A Save–On employee later discovered that the "backup money," the extra money kept in the store to make change, was missing. Tr. pp. 133–34.

On May 1, 1997, Furnish was charged with Burglary, as a Class C felony.[1] On

---

1. Furnish failed to appear for his initial hearing on May 22, 1997, and therefore, a warrant

November 1, 2001, he filed a motion to suppress the statement he made at the time of his arrest arguing that he had not yet been advised of his Miranda rights. After a hearing was held on the motion, it was denied. A jury trial was held on January 9, 2002, and at trial Furnish objected to the admission of his statement, but his objection was overruled. The jury found Furnish guilty of Burglary, as a Class C felony. The trial court sentenced Furnish to the Department of Correction for three years with credit for time served. Furnish now appeals.

### Discussion and Decision

Furnish argues that the trial court abused its discretion when it admitted the following testimony over his objection:

STATE: And what did you do when you saw this money?

OFFICER O'DELL: I asked Delbert where he got the money from. I believe I stated damn, Delbert, where'd you get all the money.

STATE: And did he answer you?

OFFICER O'DELL: He said Save–On.

Tr. p. 75.[2] Furnish argues that at the time he made the statement, he had not been advised of his Miranda rights and had not made a knowing and intelligent waiver of his right to counsel; therefore, his statement was unlawfully obtained and should not have been admitted at trial. "The admissibility of evidence is within the sound discretion of the trial court, and will not be disturbed absent a showing that the trial court abused its discretion." *Wright*

v. State, 766 N.E.2d 1223, 1229 (Ind.Ct. App.2002) (citation omitted).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend V.

Cognizant of the matrix of values safeguarded by the Fifth Amendment, the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), announced broad prophylactic measures to protect citizens interrogated while in custody. Miranda requires defendants to be adequately informed of their right to remain silent, that their statements could be used against them at trial, of their right to an attorney, and that the state will appoint an attorney for the defendant if he cannot afford one. The purpose of requiring the Miranda warnings before custodial interrogation is to combat state-sanctioned coercion.

*Allen v. State*, 686 N.E.2d 760, 769 (Ind. 1997) (internal citations omitted). "Statements that are the product of custodial interrogation prior to the advisement of the Fifth Amendment guarantee against self-incrimination are generally inadmissible." *Bailey v. State*, 763 N.E.2d 998, 1001 (Ind.2002) (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). A police officer is only required to give Miranda warnings when a defendant is both in custody and subject to interrogation. *State v. Linck*, 708 N.E.2d 60, 62 (Ind.Ct.App.1999), *trans.*

was issued for his arrest. Furnish was eventually taken into custody in August, 2001. Appellant's App. p. 2

**2.** Furnish also objected to the following testimony by Officer Jent:

OFFICER JENT: . . . [Officer O'Dell] said damn, Delbert, where'd you get all the

money from, because we just kept pulling it out of his boots, just more and more.
STATE: All right. And was there a response from the suspect?
. . .
OFFICER JENT: Yes, he said Save–On Liquor.
Tr. p. 96.

*denied.* As Furnish was in handcuffs at the time, the State does not deny that Furnish was "in custody."

"[N]ot every question a police officer asks a person in custody constitutes" an interrogation. *Murrell v. State,* 747 N.E.2d 567, 573 (Ind.Ct.App.2001), *trans. denied* (citing *Boarman v. State,* 509 N.E.2d 177, 180–81 (Ind.1987)). Interrogation has been defined to include both express questioning of the defendant and "words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response" from the defendant. *Linck,* 708 N.E.2d at 62 (citing *Curry v. State,* 643 N.E.2d 963, 977 (Ind.Ct.App.1994), *trans. denied* (citing *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980))).[3]

Our federal courts have failed to reach a consensus regarding the application of the *Innis* interrogation test taking the following approaches when interpreting the test: 1) the objective test: courts applying this test usually ask "whether a reasonable objective observer would believe that the encounter [between the officer and suspect] was 'reasonably likely to elicit an incriminating response from the suspect[;]' " 2) an understanding of *Innis* as an objective test, which also includes a consideration of the subjective intent of the police officer; 3) a subjective test which focuses on a suspect's perspective; and 4) a hybrid test combining both an objective and subjective inquiry under which both the suspect's perceptions and the officer's intent are relevant to the inquiry. Alexander S. Helderman, Article, *Revisiting Rhode Island v. Innis: Offering a New Interpretation of the Interrogation Test,* 33 Creighton L.Rev. 729, 739–44 (2000) (internal citations omitted). In determining whether a custodial interrogation has occurred, the Seventh Circuit has applied the subjective test focusing on the suspect's perspective. *See Whitehead v. Cowan,* 263 F.3d 708, 718–19 (7th Cir. 2001), *cert. denied.*[4]

Indiana courts have not expressly indicated how the *Innis* test should be applied and have simply focused their analysis on whether the officer's statement or conduct was "reasonably likely to elicit an incriminating response." *See e.g. Alford v. State,* 699 N.E.2d 247, 250 (Ind.1998); *Wright,* 766 N.E.2d at 1231; *Linck,* 708 N.E.2d at 63; *Curry,* 643 N.E.2d at 977. However, in *Carter v. State,* 634 N.E.2d 830 (Ind.Ct. App.1994), our court indicated that the *Innis* definition of interrogation "focuses on the perceptions of the suspect, rather than the intent of the police." *Id.* at 834 (citing *Innis,* 446 U.S. at 301, 100 S.Ct. 1682).

---

3. In *Innis,* the Supreme Court held that the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. *This focus reflects the fact that the* Miranda *safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.*
   *Innis,* 446 U.S. at 301, 100 S.Ct. 1682 (emphasis added).

4. *But see United States v. Westbrook,* 125 F.3d 996, 1002 (7th Cir.1997), *cert. denied* ("Following *Innis* and the law of our circuit, we consider whether a reasonable objective observer would have believed that the two questions claimed by Mr. Westbrook to have been unlawful interrogation were in fact "reasonably likely to elicit" an incriminating response.")

■ Additionally, our courts have recognized that exceptions to *Miranda* exist when officers are concerned that a weapon remains undiscovered or are concerned with locating and aiding a possible crime victim. *See Bailey,* 763 N.E.2d .at 1001–02. Also, "routine administrative questions such as name, address, height, and weight are considered within a routine booking exception and are removed from the requirements for *Miranda.*" *Wright,* 766 N.E.2d at 1231 (citing *Loving v. State,* 647 N.E.2d 1123, 1126 (Ind.1995)); *see also Serano v. State,* 555 N.E.2d 487, 493 (Ind. Ct.App.1990), *trans. denied* (citation omitted) (Police officers "are not required to give *Miranda* warnings prior to asking routine questions regarding a person's identity."). Finally, it is clear that *Miranda* is not violated if the suspect initiates conversation with a police officer and the officer does nothing more than provide a direct answer to a suspect's unsolicited inquiry. *See Broome v. State,* 687 N.E.2d 590, 599 (Ind.Ct.App.1997), *vacated in part & aff'd in part by* 694 N.E.2d 280 (Ind. 1998)[5] (citation omitted). Initially, we note that Officer O'Dell's statement does not fall clearly within one of these exceptions to *Miranda.*

While conceding that Furnish was in custody at the time the exchange between Furnish and Officer O'Dell occurred, the State argues that in making the statement "damn, Delbert, where'd you get all the money," Officer O'Dell was not attempting to elicit an incriminating response from Furnish, but was merely making an observation. The State also argues that the facts and circumstances of this case are analogous to those in *Johnson v. State,* 269 Ind. 370, 380 N.E.2d 1236 (1978).

In *Johnson,* three police officers were investigating a shooting and were informed by a witness at the scene that Johnson was responsible for the shooting. *Id.* at 1239. The witness gave the officers Johnson's address, and they found him sitting on the front porch of the house with blood on his face. *Id.* One of the officers then asked Johnson "[w]hat happened?," and he replied that he had shot a man and wanted to turn himself in. *Id.* The officer immediately read him his Miranda rights, after which, Johnson gave the officers a full confession. *Id.* On appeal, Johnson argued that the officer's query "what happened?," constituted a custodial interrogation. *Id.* at 1240. Our supreme court determined that in the context in which the query was made, where the officers had reason to suspect that Johnson was dangerous and it appeared that Johnson had just been in a fight because there was blood on his face, "the officer's opening remark was more in the nature of a greeting intended more for its calming effect than for obtaining an admission." *Id.* Therefore, the court determined that Johnson's response was a voluntary statement unsolicited by the police, particularly where Johnson continued to cooperate with the officers after he was given a full Miranda advisement. *Id.* at 1240–41. "The fact that the officer did not intend to initiate a response to interrogation is evidenced by his action in stopping [Johnson] until he had advised him of his rights and determined that he was willingly and voluntarily making a statement." *Id.* at 1241.

The State argues that, like the facts in *Johnson* where the officer's query was prompted by the blood on Johnson's face, in this case, Officer O'Dell did not intend to elicit a response and his statement was prompted by the amount of money being removed from Furnish's boot. The State contends "the phrasing of the statement

---

**5.** Our supreme court granted transfer in that case to address the issue of ineffective assistance of counsel, but summarily affirmed our court's opinion in all other respects.

itself evinces its observational rather than inquisitorial quality. The use of the expletive demonstrates the statement was a rhetorical question expressing O'Dell's amazement that multiple bundles of money had been shoved into Defendant's boot." Br. of Appellee at 6. The State also notes Officer O'Dell's testimony at the suppression hearing where he testified that he did not expect that Furnish would make an incriminating response. Officer O'Dell also stated, "I was basically making more of a statement than anything." Tr. p. 23.

Furnish argues that in determining whether Officer O'Dell's statement constitutes an interrogation, it is his perceptions, rather than the intent of the police, which controls. See Carter, 634 N.E.2d at 834. Furnish contends that due to the fact that he was under arrest, had been searched, and "was obviously in trouble with the law," Officer O'Dell's question was "investigatory in nature" particularly considering the fact that "the police had no idea that the Save–[O]n Liquor store had been burglarized." Br. of Appellant at 9–10. Furnish argues that Officer O'Dell was trying to discover where Furnish had obtained the wrapped currency and why he ran from the officers. Therefore, Furnish contends that the question does constitute an interrogation, and his response, given before he was Mirandized, was unlawfully obtained and should not have been admitted at trial. We agree.

Contrary to the State's argument, the facts of this case are distinguishable from the facts in Johnson because the police officer's question in Johnson was prompted by a safety concern about blood on the defendant's face. In addition, unlike the facts in this case, the defendant in John-

son was not in handcuffs at the time the question was asked. Most importantly, in Johnson, our supreme court determined that the defendant's statement was voluntary in large part because he continued to cooperate with police after he was Mirandized.

It is reasonable to assume that when Officer O'Dell made the statement to Furnish, O'Dell had reason to believe that Furnish had committed a crime, in light of the fact that Furnish ran from and lied to the police, and that the money pulled from Furnish's boots was wrapped in bank wrappers.[6] Under the facts apparent at that time, Officer O'Dell should have known that his statement was reasonably likely to elicit an incriminating response. Therefore, we hold that under these facts and circumstances, the trial court abused its discretion when it admitted Furnish's statement into evidence at trial over objection.

■ However, the State contends that even if the trial court abused its discretion when it admitted Furnish's statement at trial, the error was harmless. "[S]tatements obtained in violation of Miranda and erroneously admitted are subject to harmless error analysis." Morales v. State, 749 N.E.2d 1260, 1267 (Ind.Ct.App.2001). If the conviction is supported by substantial independent evidence of guilt that satisfies the court on appeal that there is no substantial likelihood the challenged evidence contributed to the conviction, the improper admission of evidence is harmless. Id. "A federal constitutional error is reviewed de novo and must be 'harmless beyond a reasonable doubt.'" Id. (citing Alford, 699 N.E.2d at 251 (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17

---

6. At trial, Officer O'Dell was asked, "[d]id you notice anything remarkable about the money[?]" Officer O'Dell responded, "[i]t still had money wrappers wrapped around it." Tr. p. 75. O'Dell made this observation before he asked Furnish where he got the money.

L.Ed.2d 705 (1967))). "The court must find that the error did not contribute to the verdict, that is, that the error was unimportant in relation to everything else the jury considered on the issue in question." *Id.* Finally, "[a]dmission of a confession is harmless if it does not contribute to the conviction." *Morgan v. State,* 759 N.E.2d 257, 262 (Ind.Ct.App.2001) (citation omitted).

The State relies on the following evidence admitted at trial to support its argument that the admission of Furnish's statement was harmless error: 1) Officer O'Dell saw Furnish running away from the Save–On Liquor store; 2) it was later determined that the Save–On was broken into and the store's "backup money" was missing; 3) the "backup money" was in one, five, and ten dollar bill denominations and the money found in Furnish's boots consisted of stacks of money in small denominations wrapped in bank wrappers; and, 4) Furnish's brother was aware of the location of the "backup money." Although this evidence is significant, the only direct evidence that Furnish committed the burglary at the Save–On liquor store was his own statement, and we cannot conclude that its admission did not contribute to Furnish's conviction. Therefore, given the incriminating nature of Furnish's statement to Officer O'Dell, the trial court's admission of the statement was not harmless error.

### Conclusion

In the context in which it was made, Officer O'Dell's statement, "damn, Delbert, where'd you get all the money" constituted an interrogation at a time when Furnish had not been Mirandized. The trial court therefore abused its discretion when it admitted the statement at trial. Also, the admission of the statement was not harmless error. Accordingly, we reverse Fur-

nish's conviction for Burglary, as a Class C felony, and remand for a new trial.

Reversed and remanded for a new trial.

BARNES and VAIDIK, JJ., concur.