# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**JOHN P. BRINSON**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

ROBERT E. HICKS, )
)
)
Appellant-Defendant, )
)
vs. ) No. 82A01-1306-CR-256
)
STATE OF INDIANA, )
)
)
Appellee-Plaintiff. )

### APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable David D. Kiely, Judge
Cause No. 82C01-1207-MR-887

**March 11, 2014**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Following a jury trial, Robert E. Hicks ("Hicks") was convicted in Vanderburgh Circuit Court of murder and sentenced to fifty-five years in the Indiana Department of Correction. Hicks appeals and claims that the trial court abused its discretion by admitting into evidence recorded statements made by Hicks to the police in which he admitted to killing the victim.

We affirm.

**Facts and Procedural History**

In the summer of 2012, Hicks lived with the victim in this case, his long-time girlfriend Anna Jochum ("Jochum"). The couple often argued about money and Hicks's use of alcohol and drugs. On July 2, 2012, Jochum's niece, C.D., visited her aunt. Shortly after C.D. left, Hicks and Jochum got into an argument. Jochum grabbed a knife and threatened to "kick [Hicks's] ass again," referring to an earlier altercation in which Jochum had injured Hicks. Tr. p. 108. Hicks stated, "not this time, honey," and grabbed her by the throat and knocked the knife out of her hands. Id. Hicks then grabbed a large block of wood that the couple used to prop open a bathroom window and hit Jochum in the head several times. After Hicks struck her in the back of the neck with the block, Jochum stopped moving. Hicks then picked up the knife Jochum had brandished and stabbed her repeatedly on the left side of her body. Hicks realized that he had killed Jochum and placed her body in the bathroom next to the side of the bathtub. He then threw a mattress on top of the tub. Hicks washed his hands, changed his clothes, and left. He eventually went across the Ohio River to Henderson, Kentucky and went to the Harbor House homeless shelter.

Jochum's niece was unable to reach her aunt by telephone and decided to go check on Jochum on July 8, 2012. When she did, she noticed a foul odor, and her knocks on the door went unanswered. Then, on July 12, Jochum's niece and her mother went to the apartment and asked the maintenance man to open the door. When they entered the apartment, they found Jochum's decomposing body in the bathroom. They then telephoned the police.

The police investigation revealed that Jochum had several blunt-force injuries to her head and neck and that her cause of death was two fractured and displaced vertebrae in her neck, which lacerated her spinal cord. This injury caused paralysis and a quick death. She also sustained over fifty stab wounds on her left shoulder, chest, and leg. The police were also informed that Hicks had been living with Jochum but was missing. The police decided to locate Hicks to see if he was a victim or knew anything about Jochum's death, but there was as of yet no evidence linking him to the crime. The police issued a bulletin to surrounding jurisdictions indicating that Hicks was a person of interest with whom they would like to speak. On July 13, 2012, Harbor House contacted local police to inform them that Hicks was staying there.

Sergeant Larry Nelson ("Sgt. Nelson") and Detective Jeffrey Jones ("Detective Jones") of the Evansville Police Department went to the Henderson, Kentucky homeless shelter to speak with Hicks. When they arrived, Hicks was sitting outside near the rear of the shelter, smoking a cigarette, with a local police officer standing nearby. Sgt. Nelson told Hicks that Jochum was dead, but Hicks made no response. The officers then asked if Hicks would be willing to speak with them and gave him the option of speaking with

them at the local Henderson Police Department or going back to Indiana to the Evansville Police Department. Hicks agreed and chose to speak with the officers at the Henderson Police Department. Hicks was not placed in handcuffs or restrained and was driven by the police to the police station. There, he was taken to an interview room which measured approximately 4' by 8' in size. Because they did not yet consider Hicks to be a suspect, the police did not advise Hicks of his rights, nor did they record the interview. During this "pre-interview," the police asked Hicks for general information about Jochum and precisely when he had gone to Kentucky. Hicks told the police that he left because he and Jochum had argued and that she had kicked him out of the apartment.

At this point, Sgt. Nelson began to suspect Hicks in the murder and decided to do a more in-depth interrogation of Hicks. He therefore read Hicks his Miranda rights and began to record the interview. Hicks signed a waiver of his Miranda rights and again told the police that he and Jochum had gotten into an argument. This time, however, he added that Jochum had threatened him and that the two had gotten into a physical altercation, which ended in the bathroom when Hicks struck Jochum on the head with a block of wood. Hicks claimed, however, that he did not know that Jochum was dead. He simply shut the bathroom door and left. Hicks did not mention stabbing Jochum, and at this time, the police were apparently unaware that Jochum had been stabbed. The police then arrested Hicks for Jochum's murder, and he waived extradition to Indiana.

The following day, Sgt. Nelson was given information from Jochum's autopsy which indicated that she had sustained multiple stab wounds. Sgt. Nelson decided to confront Hicks with this information and asked if Hicks would speak to him again. Hicks

4

agreed and was again advised of his Miranda rights and signed a written waiver of these rights. This interrogation was also recorded. Hicks again admitted to striking Jochum with the wooden block. But this time, he also admitted to stabbing her several times, then dragging her body into the bathroom.

On July 13, 2012, the State charged Hicks with murder. On January 29, 2013, Hicks filed a motion to suppress the statements he had given to the police. On March 13, 2013, the trial court held a suppression hearing. On April 1, 2013, the trial court granted the motion with regard to the first "pre-interview," but denied it as to the two recorded interviews where Hicks had been advised of and waived his Miranda rights. On April 29, 2013, a jury trial commenced. At the conclusion of the trial, the jury found Hicks guilty as charged. At the conclusion of a sentencing hearing held on May 28, 2013, the trial court sentenced Hicks to the advisory term of fifty-five years. Hicks now appeals.

**Standard of Review**

Because Hicks appeals following his conviction, the question before us is whether the trial court abused its discretion in the admission of the evidence in question. Shell v. State, 927 N.E.2d 413, 418 (Ind. Ct. App. 2010). The trial court has broad discretion in ruling on the admissibility of evidence, and we will reverse the trial court's ruling only when the trial court abuses that discretion. Fuqua v. State, 984 N.E.2d 709, 713-14 (Ind. Ct. App. 2013), trans. denied. The trial court abuses its discretion only if its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. Id. Regardless of whether the challenge is made through a pretrial motion to suppress or by an objection at

trial, our review of rulings on the admissibility of evidence is essentially the same: we do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling, but we may also consider any undisputed evidence that is favorable to the defendant. Id. Additionally, we may consider foundational evidence introduced at trial in conjunction with any evidence from a suppression hearing that is not in direct conflict with the trial evidence. Kelley v. State, 825 N.E.2d 420, 427 (Ind. Ct. App. 2005).

**Discussion and Decision**

On appeal, Hicks claims that the trial court abused its discretion in admitting into evidence the two recorded interviews wherein he admitted to striking and then stabbing Jochum. He presents several arguments to support his claim that the trial court should have suppressed his statements.

*A. Request for Counsel*

First, Hicks argues that he was in custody and requested counsel and that therefore the police should have immediately stopped the interrogation. When a suspect who is subject to custodial interrogation requests the assistance of counsel, all questioning must immediately cease and interrogation can be resumed only when the suspect initiates a communication with police, and when it is apparent that he knowingly and intelligently waived his right to counsel. Mendoza-Vargas v. State, 974 N.E.2d 590, 594 (Ind. Ct. App. 2012) (citing Moore v. State, 498 N.E.2d 1, 8 (Ind. 1986); Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983)).

At the suppression hearing, Hicks testified that he told the investigating officers, "I th[ink] I should talk to an attorney." Suppression Hearing Tr. p. 72. Because neither of the officers testified directly contrary to this, Hicks claims that his request for counsel must be treated as an established fact. We disagree. While our standard of review permits us to consider uncontroverted evidence favorable to the defendant, see Fuqua, 984 N.E.2d at 714, we do not take this to mean that any testimony by the defendant that is not directly contradicted must be accepted as true by the trial court or this court. To hold otherwise would be to deny the trial court, acting as the trier of fact in such matters, the right to judge the credibility of witnesses. See Griffin v. State, 493 N.E.2d 439, 443 (Ind. 1986) (noting that jury, as the trier of fact, had the right to discredit the defendant's uncontroverted alibi evidence); Morphew v. Morphew, 419 N.E.2d 770, 777 (Ind. Ct. App. 1981) (noting that uncontroverted evidence is not necessarily binding on the trier of fact and may be disbelieved and given no weight), *superseded by statute on other grounds as noted in* Indiana-American Water Co. v. Ind. Office of Util. Consumer Counselor, 844 N.E.2d 106, 119 (Ind. Ct. App. 2006).

Here, it is apparent that the trial court simply did not credit Hicks's self-serving testimony that he requested counsel; otherwise the court would not have admitted any of Hicks's statements. See Thurman v. State, 793 N.E.2d 318, 321 (Ind. Ct. App. 2003) (noting that appellate court will presume that trial courts know and follow the applicable law). Therefore, we reject Hicks's claim that the trial court abused its discretion in the

7

admission of all of his statements to the police solely because of his uncontroverted, alleged request for counsel.[1]

*B. Custodial Interrogation*

Hicks also claims that he was subject to custodial interrogation. The State claims that Hicks was never handcuffed and that his interview with the police was, at least initially, non-custodial. The police are required to advise a suspect of his Miranda rights only if the suspect is subjected to custodial interrogation. Luna v. State, 788 N.E.2d 832, 833 (Ind. 2003) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)).[2] Accordingly, Miranda warnings do not need to be given when the person questioned has not been placed in custody. State v. Hicks, 882 N.E.2d 238, 241 (Ind. Ct. App. 2008). In determining whether a person was in custody or deprived of freedom such that Miranda warnings are required, our ultimate inquiry is whether there is a formal arrest or a restraint of the freedom of movement of the degree associated with a formal arrest. Id.

---

[1] Moreover, we do not think that Hicks's statement of "I thought I should talk to an attorney" was, as he claims, necessarily a clear and unequivocal request for counsel. See United States v. Delaney, 443 F. App'x 122, 130 (6th Cir. 2011) (concluding that defendant's statement of "I think I should talk to a lawyer, what do you think?" used the equivocal language of "I think" and did not constitute an unambiguous request for counsel); Clark v. Murphy, 331 F.3d 1062, 1069-72 (9th Cir. 2003) (holding that "I think I would like to talk to a lawyer" was not an unequivocal request for counsel), *overruled in part on other grounds*, Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Burket v. Angelone, 208 F.3d 172, 198 (4th Cir. 2000) (holding that "I think I need a lawyer" was not an unequivocal request for counsel); State v. Eastlack, 883 P.2d 999, 1006-07 (Ariz. 1994) (noting that defendant's statement of "I think I better talk to a lawyer first" used the equivocal language of "I think" and did not constitute an unambiguous request for counsel). But see Alford v. State, 699 N.E.2d 247, 251 (Ind. 1998) (defendant's statement that "I think it would be in my best interest to talk to an attorney" was an unequivocal request for counsel); State v. Munson, 594 N.W.2d 128, 139 (Minn. 1999) (holding that defendant's statement of "I think I'd rather talk to a lawyer," was sufficiently clear as to be understood as a request for counsel).

[2] Hicks also presents a claim under the Indiana Constitution. But on this issue, under either the federal Constitution or the Indiana Constitution, our analysis is the same. See Malinski v. State, 794 N.E.2d 1071, 1077 (Ind. 2003) (holding that privilege against self-incrimination in Indiana Constitution does not afford custodial suspects any more protection that the federal Fifth Amendment).

(citing California v. Beheler, 463 U.S. 1121, 1125 (1983)). We make this determination by examining whether a reasonable person in similar circumstances would believe he is not free to leave. Id. We examine all the circumstances surrounding an interrogation, and are concerned with objective circumstances, not upon the subjective views of the interrogating officers or the suspect. Id. If the police, by means of physical force or show of authority in some way restrained the liberty of the suspect, we will conclude that the suspect was seized and in custody.

Here, the evidence shows that when the Evansville police officers arrived at the Henderson, Kentucky homeless shelter Hicks was staying in, Hicks was sitting outside, smoking a cigarette, with a Henderson police officer standing nearby. The Evansville police asked Hicks if he would speak to them about Jochum's death, and he agreed to go to the local, Henderson police station to speak with the police.[3] The officers did not restrain Hicks, nor did they order him to go to the station.

Once at the station, the officers took Hicks to a small interview room and began to interview him. They did not inform him that he was free to leave, see tr. p. 70, and the interview room was in an area that was accessible only through a locked door. From this, the trial court could have reasonably concluded that Hicks was not free to leave and was therefore in custody. Indeed, the trial court did suppress the statements Hicks made prior to his being advised of his Miranda rights. See King v. State, 844 N.E.2d 92, 97 (Ind. Ct.

---

[3] Hicks claims that the police gave him only the choice to go to the Kentucky or the Evansville police stations to speak. However, in context, the testimony of the officers indicates that Hicks agreed to go with them to speak, not that they ordered him to do so. See Suppression Hearing Tr. p. 8 (indicating that Sgt. Nelson asked Hicks if he would go to the police department and that "[Hicks] agreed to this."); id. at 20 ("[Hicks] agreed to go with us to [the Henderson Police Department].").

App. 2005) (concluding that statements made during custodial interrogation but prior to suspect being advised of his Miranda rights should have been suppressed). But even if we assume *arguendo* that Hicks was in custody, this does not mean that the trial court should have suppressed Hicks's statements.

Once the interrogating officers discovered that Hicks had been in an argument with Jochum before he left the apartment, they clearly read him his Miranda rights and Hicks signed a waiver of these rights. Hicks does not deny this. Instead, Hicks claims that the police engaged in the sort of "question-first, Mirandize-later" approach that was condemned by the United States Supreme Court in Missouri v. Seibert, 542 U.S. 600 (2004). In that case, the Court disapproved of an interrogation technique in which interrogating officers purposefully withhold Miranda warnings until after a suspect has confessed, and thereafter, give Miranda warnings and secure a waiver before obtaining a second, similar confession. Id. at 611-14; see also King, 844 N.E.2d at 98 (summarizing the Seibert holding).

As the Court in Seibert explained:

Upon hearing warnings only in the aftermath of interrogation *and just after making a confession*, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," *without expressly excepting the statement just given*, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and

10

the consequences of abandoning them." By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because Miranda warnings formally punctuate them in the middle.

542 U.S. at 613-14 (internal citations omitted) (emphases supplied).

Indiana courts have applied Seibert to those situations in which a defendant was interrogated and confessed without a Miranda advisement and was then given a Miranda advisement and repeated the confession. See Kelly v. State, 997 N.E.2d 1045, 1054-55 (Ind. 2013) (defendant given Miranda advisement only after making specific, incriminating statements that were then used to prod the defendant to make further incriminating statements following Miranda advisement); Morris v. State, 871 N.E.2d 1011, 1018-19 (Ind. Ct. App. 2007) (police began interview before advising defendant of her Miranda rights and gave advisement only after defendant implicated herself in victim's death, after which she again repeated her statement); Payne v. State, 854 N.E.2d 7, 15 (Ind. Ct. App. 2006) (officers waited to advise defendant of her Miranda rights until after she had made incriminating statements, after which defendant was read advisement and again confessed); Drummond v. State, 831 N.E.2d 781, 784 (Ind. Ct. App. 2005) (defendant was given Miranda advisement only after he had made incriminating statements); King, 844 N.E.2d at 98 (defendant given Miranda advisement and police only recorded statement after defendant had made incriminating statements). But this is not what happened here.

According to the interrogating officers, they simply asked Hicks basic questions during the initial "pre-interview," and Hicks did not admit to killing or harming Jochum.

11

He instead simply stated that he had gotten into a verbal argument with her. Although Hicks contested this at the suppression hearing, and claims on appeal that the officers were untruthful, we cannot judge the credibility of witnesses or reweigh evidence on appeal. Fuqua, 984 N.E.2d at 713. Thus, the facts of the present case are unlike those in Seibert, and the Indiana cases cited above, where the police obtained a second, post-Miranda-warning confession immediately after first obtaining a pre-Miranda-warning confession.

Instead, this situation is more like that in Maxwell v. State, 839 N.E.2d 1285, 1288 (Ind. Ct. App. 2005), where the defendant did not confess to committing the crime prior the officers advising him of his Miranda rights. On appeal, this court declined to extend the holding in Seibert to prohibit any pre-Miranda warning conversations with the police. Id. Therefore, we cannot agree with Hicks that the incriminating statements he made to the police after he had been read and waived his Miranda rights should have been suppressed.[4]

**Conclusion**

The trial court did not have to credit Hicks's testimony that he requested the assistance of counsel prior to waiving his Miranda rights. And even if Hicks was in

---

[4] Moreover, even if the entirety of the first interview should have been suppressed, this does not necessarily mean that the second interview—conducted the following day and at which Hicks was again advised of and waived his Miranda rights—should also have been suppressed. See State v. Keller, 845 N.E.2d 154, 167 (Ind. Ct. App. 2006) (concluding that, despite lack of knowing waiver of Miranda rights during first interview during which defendant made incriminating statements, statements made by the defendant during second interview conducted the following day in which a knowing waiver was obtained was admissible because such a situation bore little resemblance to the situation in Seibert where the police purposefully withheld Miranda warnings until confession was obtained). And it was in this second interview that Hicks made a more detailed confession in which he admitted to stabbing Jochum.

custody during the interrogations, by the time of his second interview, which was a day after his first interviews, he was advised of, and waived, his Miranda rights. Because Hicks did not confess prior to being read his Miranda rights, Seibert is inapplicable. Therefore, we conclude that the trial court did not abuse its discretion in admitting into evidence the two recorded statements Hicks made to the police after he had been advised of, and waived, his Miranda rights.

Affirmed.

BRADFORD, J., and PYLE, J., concur.