

FILED

Dec 19 2019, 9:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Christopher Taylor-Price
Marion County Public Defender Agency
– Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael Scanland,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | December 19, 2019<br><br>Court of Appeals Case No.<br>19A-CR-790<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable John M. Christ,<br>Magistrate<br><br>Trial Court Cause No.<br>49G14-1801-F6-1620 |

**Mathias, Judge.**

[1]     Following a jury trial in Marion Superior Court, Michael Scanland ("Scanland") was convicted of Class C misdemeanor possession of paraphernalia and sentenced to forty days in jail. Scanland appeals and presents

two issues, which we restate as: (1) whether the trial court abused its discretion by determining that Scanland was not subject to custodial interrogation and that the statements he made to a parole agent were therefore admissible even though Scanland was not advised of his *Miranda* rights; and (2) whether the trial court abused its discretion by admitting evidence of drug paraphernalia found in Scanland's home following a search based on the statements Scanland made to the parole agent. Concluding that Scanland was not subject to custodial interrogation, we affirm.

## Statement of Facts[1]

[2]    Scanland was convicted of murder in 1995. He was released on parole on December 22, 2016. The terms of his parole release agreement included the following:

> **5. ABUSE OF ALCOHOL OR CONTROLLED SUBSTANCE** – I understand that the following is a violation of my parole:
>
> a) Being intoxicated, or

---

[1] We held oral argument in this case on December 10, 2019, at Winamac Community High School in Winamac in Pulaski County, Indiana. We thank the faculty, staff, and students of Winamac Community High School for their gracious hospitality, and we thank all students present for their attention during the argument and their thoughtful questions following the argument. We also commend counsel for both parties for the quality of their written and oral advocacy. Lastly, we note that, with this oral argument in Pulaski County, our court has now held an oral argument in all ninety-two Indiana counties through our Appeals on Wheels program.

b) *Using, possessing, or trafficking illegally in a controlled substance.* Abuse of alcohol or drugs is not a defense for violation of the parole release agreement.

\* \* \*

**7. CRIMINAL CONDUCT** – *I will not engage in conduct prohibited by federal or state law or local ordinance.*

\* \* \*

**9. HOME VISITATION AND SEARCH** –

a) I will allow my supervising officer or other authorized officials of the Department of Correction to visit my residence and place of employment *at any reasonable time.*

b) I understand that I am legally in the custody of the Department of Correction and that *my person and residence or property under my control may be subject to reasonable search by my supervising officer or authorized official of the Department of Correction if the officer or official has reasonable cause to believe that the parolee is violating or is in imminent danger of violating a condition to remaining on parole.*

Ex. Vol., State's Ex. 1 (emphases added).

[3] In January 2018, Scanland was living with his girlfriend Sandra Burrow ("Sandra") in Marion County, Indiana. Scanland and Sandra had issues with their neighbor, and the police were called to Scanland's home several times as a result. During one altercation, the neighbor, according to Scanland, threatened his life. Sandra called the police to report this, and the police investigated. Scanland later called the police himself to obtain the incident report number.

The supervising officer on duty, Sgt. Stargel, told Scanland to go to Indianapolis Metropolitan Police Department ("IMPD") Northwest District Headquarters the following day and speak with Sgt. Grimes for assistance with mediating the dispute with his neighbor. Sgt. Stargel also advised Scanland to talk to his parole officer. Sgt. Stargel then emailed Sgt. Grimes about Scanland, an email that was later forwarded to another parole agent, Eric Vanatti ("Agent Vanatti"), who worked at the Northwest District Headquarters.

[4]     The day after the incident with the neighbor, Scanland and Sandra went to the Northwest District Headquarters to speak with Sgt. Grimes. Believing that they were not getting proper assistance, Scanland and Sandra became upset. From his office, Agent Vanatti heard a man shouting and a woman crying. He got up to investigate and saw Scanland and Sandra causing the disturbance. Agent Vanatti was wearing a polo shirt and his badge. He asked Scanland to sit at a table in the lobby, but Scanland remained standing.

[5]     Agent Vanatti asked Scanland to come to his office. There, Agent Vanatti asked Scanland to take a drug test, as Vanatti believed Scanland to be under the influence of a controlled substance. Scanland, who was still agitated, responded, "I'm not going to. I'm dirty," meaning that he had been using illicit drugs. Tr. Vol. 2, p. 25. When Agent Vanatti asked what drug Scanland had been using, he told Vanatti that he had been using methamphetamine. *Id*. at 174. Agent Vanatti told Scanland that he still needed to do a urine screen and took him to the restroom. Scanland, however, refused to submit to the test.

Agent Vanatti therefore took Scanland back to his office, where Scanland confirmed yet again that he refused to submit to the drug screen. Agent Vanatti then placed Scanland in handcuffs and began to complete a Department of Correction ("DOC") form titled "TRANSMITTAL – PAROLE BOARD ACTION," detailing Scanland's refusal to submit to the drug screen, his conflict with his neighbor, and requesting a warrant for Scanland's arrest. Ex. Vol., Defendant's Ex. D.

[6] As Agent Vanatti typed up his report, Scanland stated, without prompting, that he had been using methamphetamine from 2:00 a.m. to 11:00 a.m. that morning. He then asked Agent Vanatti to go to Scanland's home and retrieve the pipe he used to smoke methamphetamine. Scanland stated that the pipe was hidden inside a sock in a dresser drawer of his bedroom. Scanland wanted Agent Vanatti to get the pipe because he was afraid that Sandra might find it and was concerned for her health.[2]

[7] Agent Vanatti, two other parole agents, and an IMPD officer accompanied Scanland to his home. The officers searched for and found two pipes hidden in dresser drawers in Scanland's bedroom. One pipe was found inside a sock and the other inside a glove. The officers then obtained a warrant to search the

---

[2] Scanland also told Agent Vanatti that he "didn't want to do what he did to the person as to why he was on parole," i.e., murder, and was concerned that his conflict with his neighbor might escalate to that point. Tr. Vol. 2, p. 15.

home for drugs. Subsequent testing revealed the presence of methamphetamine residue on the pipes.

## Procedural History

[8] On January 16, 2018, the State charged Scanland with Level 6 felony possession of methamphetamine and Class C misdemeanor possession of paraphernalia.[3] Scanland filed a motion to suppress on July 2, 2018, claiming that the statements he made to Agent Vanatti were inadmissible because he had not been advised of his *Miranda* rights and that the evidence found during the subsequent search of his home was inadmissible as it was conducted due to his inadmissible statements. The trial court held a hearing on Scanland's motion on August 23, 2018, and entered an order denying the motion on November 1, 2018. Scanland filed a motion to correct error[4] on November 27, 2018, which the trial court denied on January 18, 2019.

[9] A jury trial was held on March 11, 2019. At trial, Scanland objected to the introduction of his statements to Agent Vanatti and the admission of the drug pipes. The trial court overruled Scanland's objections, and the jury found

---

[3] The State also charged Scanland with Class B misdemeanor possession of marijuana, but the State dismissed this charge prior to trial.

[4] Because Scanland's motion asked the trial court to reconsider its ruling on his pre-trial motion to suppress, which is not a final appealable order, the motion was actually a motion to reconsider, not a motion to correct error. *See Citizens Indus. Grp. v. Heartland Gas Pipeline, LLC*, 856 N.E.2d 734, 737 (Ind. Ct. App. 2006) (noting that a party may file a motion to reconsider while the case is in fieri and that a motion to correct error is proper only after the entry of final judgment), *trans. denied*.

Scanland guilty of possession of paraphernalia but not guilty of possession of methamphetamine. The trial court sentenced Scanland to forty days in jail, with credit for twenty days already served.[5] Scanland now appeals.

## Standard of Review

Because Scanland appeals following his conviction, and not from an interlocutory order denying his motion to suppress, the issue before the court is one of the admission of evidence. *See Hicks v. State*, 5 N.E.3d 424, 427 (Ind. Ct. App. 2014), *trans. denied*. A trial court has broad discretion in ruling on the admissibility of evidence, and we will reverse the trial court's ruling only when the trial court abuses that discretion. *Id.* A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id.* Whether the challenge is made through a pretrial motion to suppress or by an objection at trial, our review of rulings on the admissibility of evidence is essentially the same, i.e. we do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling, but we may also consider any undisputed evidence that is favorable to the defendant. *Id.* Additionally, we may consider foundational evidence introduced at trial in conjunction with any evidence from a suppression hearing that is not in direct conflict with the trial

---

[5] We note that, as a result of this incident, Scanland's parole was revoked, and the Indiana Department of Correction's online "Offender Search" now lists Scanland's "earliest possible release date" as 2035. *See* https://www.in.gov/apps/indcorrection/ofs/ofs?lname=scanland&fname=michael&search1.x=0&search1.y=0.

evidence. *Id.* At a suppression hearing, the State bears the burden of demonstrating the constitutionality of measures it used to secure evidence. *McIntosh v. State*, 829 N.E.2d 531, 536 (Ind. Ct. App. 2005), *trans. denied*.

### I. Scanland's Statements to the Parole Agent

[11] Scanland claims that he was in custody and subject to the functional equivalent of interrogation and that he should therefore have been advised of his *Miranda* rights. Because he was not so advised, Scanland argues that his statements to the police should have been excluded.

[12] The Fifth Amendment to the United States Constitution grants to individuals the right to be free from self-incrimination. *Hartman v. State*, 988 N.E.2d 785, 788 (Ind. 2013) (citing U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself. . . .")). This constitutional protection applies to the states via the Fourteenth Amendment. *Id.* (citing *Malloy v. Hogan*, 378 U.S. 1, 6 (1964)).[6] In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the United States Supreme Court held that, to protect this right against self-incrimination, a person questioned by law enforcement officers after being taken into custody or otherwise deprived of his freedom of action in any significant way must first be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him,

---

[6] The Indiana Constitution contains a similarly worded protection against compelled self-incrimination. *See* Ind. Const. Art. 1, Sec. 14 ("No person, in any criminal prosecution, shall be compelled to testify against himself."). Scanland makes no argument under the Indiana Constitution.

and that he has a right to the presence of an attorney, either retained or appointed. *See State v. Brown*, 70 N.E.3d 331, 335 (Ind. 2017) (summarizing *Miranda* holding).

[13] Statements obtained from the custodial interrogation of a suspect who has not been advised of his or her *Miranda* rights are generally inadmissible. *Bailey v. State*, 763 N.E.2d 998, 1001 (Ind. 2002) (citing *Miranda*, 384 U.S. at 444). An officer is only required to give *Miranda* warnings when a defendant is both (1) in custody and (2) subject to interrogation. *Furnish v. State*, 779 N.E.2d 576, 578–79 (Ind. Ct. App. 2002), *trans. denied*.

*A. Custody*

[14] The question of whether a person is in custody for purposes of *Miranda* is a mixed question of fact and law. *State v. Ruiz*, 123 N.E.3d 675, 679 (Ind. 2019). The test for whether a defendant is in custody is not whether a defendant feels free to go, but rather whether there was a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Brown*, 70 N.E.3d at 336 (citing *Stansbury v. California*, 511 U.S. 318 (1994)). We look to the totality of the circumstances to determine whether a person was in custody. *Brown*, 70 N.E.3d at 335.

[15] Scanland argues that, once he was placed in handcuffs in Agent Vanatti's office, he was in custody. Indeed, we have held before that the use of handcuffs restrains an individual's freedom of movement to the degree associated with a

formal arrest. *Wright v. State*, 766 N.E.2d 1223, 1230 (Ind. Ct. App. 2002) (citing *Loving v. State*, 647 N.E.2d 1123, 1125 (Ind. 1995)); *see also Hudson v. State*, 129 N.E.3d 220, 225 (Ind. Ct. App. 2019) (holding that suspect who was placed in handcuffs was in custody). The State does not deny that, once Scanland was placed in handcuffs, he was in custody.

[16] It is therefore undisputed that Scanland was in custody for *Miranda* purposes after he was placed in handcuffs in Agent Vanatti's office, which was when he made the incriminating statements regarding the drug pipes in his home. Because it is undisputed that Scanland was in custody at the time he made his incriminating statements, we must determine whether he was subject to interrogation while in custody. *See Furnish*, 779 N.E.2d at 578–79.

*B. Interrogation*

[17] Scanland argues that the statements he made to Agent Vanatti regarding the drug pipes in his home were made during the functional equivalent of interrogation, thus necessitating a *Miranda* advisement. Scanland is correct that, under *Miranda*, "'interrogation' refers to 'either express questioning or its functional equivalent.'" *Hartman*, 988 N.E.2d at 788 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The functional equivalent of interrogation "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *B.A. v. State*, 100 N.E.3d 225, 233 (Ind. 2018), "Police custody alone does not trigger *Miranda*; there must be

police interrogation as well.") *Id.* (citing *Innis*, 446 U.S. at 301). The focus is the suspect's perceptions, not police intent. *Id.* The focus on the suspect's perception "reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Innis*, 446 U.S. at 301.

[18]  However, "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known were reasonably likely to elicit an incriminating response*." *Id.* at 301–02 (emphasis added). In contrast, "[a] wholly volunteered and unsolicited statement by the accused is not the product of a custodial interrogation such that any advisement of rights need be given." *Tacy v. State*, 452 N.E.2d 977, 982 (Ind. 1983).

[19]  Scanland contends that the totality of circumstances surrounding his statements constituted the functional equivalent of interrogation.[7] Specifically, he notes that, at the time of his statement, he was handcuffed and seated in Agent Vanatti's office as Vanatti typed up a report that included a request for a

---

[7] Scanland appears to argue that Agent Vanatti should have known that his action of taking Scanland into custody was reasonably likely to evoke an incriminating response given Scanland's status as a parolee. But this conflates the question of custody with the question of interrogation. "[An] interrogation must involve a measure of compulsion beyond that inherent in custody itself[.]" *Hudson*, 129 N.E.3d at 225.

warrant based on Scanland having violated his parole by using methamphetamine. Scanland also notes that Agent Vanatti knew that he was on parole, agitated, and likely still under the influence of methamphetamine. But this falls short of conduct Agent Vanatti should have known was reasonably likely to evoke an incriminating response.[8]

[20] Agent Vanatti repeatedly testified that he did not ask any questions of Scanland prior to Scanland's statements regarding the pipes. Although Scanland claims that Agent Vanatti was talking to him, Agent Vanatti testified that Scanland made his incriminating statements while Vanatti was busy completing the Transmittal form, and the trial court was within its discretion to credit Agent Vanatti's testimony over Scanland's. *See* note 8, *supra.* Nothing Agent Vanatti said or did was the functional equivalent of interrogation. Indeed, there is no indication that Agent Vanatti spoke with Scanland in any manner in an attempt to get incriminating statements from him. *Cf. Brewer v. Williams*, 430 U.S. 387, 392–93 (1977) (holding that officer's statements to defendant that he should

---

[8] Scanland also claims that Agent Vanatti told Sandra that Scanland was going back to prison for violating parole. He also claims that Vanatti told someone on the telephone that there were "bricks of dope" in Scanland's home. Tr. Vol. 2, p. 73. These allegations, however, are supported only by Scanland's testimony, which the trial court was not obligated to credit. At oral argument, Scanland contended that his statements were uncontradicted and noted that we may consider undisputed evidence that is favorable to the defendant. *Hicks*, 5 N.E.3d at 427. Although not specifically contradicted by Agent Vanatti, his testimony did not include any account of such statements to Scanland. Thus, we do not consider these facts to be truly undisputed.

disclose the location of the child victim's body so that there could be a "Christian burial" was the functional equivalent of an interrogation).[9]

[21] In short, the trial court did not abuse its discretion by determining that, even though Scanland was in custody when he made the statements regarding the drug pipes in his home, he was not subject to interrogation or the functional equivalent thereof. His statements were instead voluntary and therefore admissible even though Scanland was not advised of his *Miranda* rights.

## II. The Search of Scanland's Home

[22] Scanland also argues that the search of his home was unreasonable because it was based on his statements that he claims were obtained in violation of his *Miranda* rights. Scanland notes that the terms of his parole release agreement state that he was subject to "reasonable search" by his parole officer or an official of the DOC "if the officer or official has reasonable cause to believe that the parolee is violating or is in imminent danger of violating a condition to remain on parole." Ex. Vol., State's Ex. 1. Scanland argues that the search

---

[9] Scanland notes that Vanatti asked him to fill out an "admission of guilt" form wherein he admitted that he had used methamphetamine. But Vanatti asked Scanland to fill out this form only after Scanland admitted that he had drug pipes in his home. Tr. Vol. 2, pp. 13–14. Thus, this request could not be considered interrogation that led to the incriminating statements. We acknowledge that, after Scanland stated that he would test positive for illicit drug use, Vanatti asked Scanland what drugs he had been using, to which Scanland replied that he had been using methamphetamine. To be sure, this was an express question. But this occurred when Scanland first refused to submit to the drug screen, which was before he was placed in handcuffs. Tr. Vol. 2, pp. 13, 25, 174, 198. Thus, Scanland was not in custody when asked this question. Moreover, by stating that he would fail the drug test, Scanland had already admitted to using illicit drugs.

cannot be deemed reasonable or justified by reasonable cause because the search of his home was based on statements that, he claims, were obtained in violation of *Miranda*.[10]

[23] We have already concluded, however, that Scanland's statements to the parole agent regarding the drug pipes in his home were not the product of a custodial interrogation. His statements alone were sufficient to establish reasonable cause to believe that Scanland was in violation of the terms of his probation by using illicit drugs and possessing drug paraphernalia.

[24] It is also important to remember that Scanland's behavior and statements to Agent Vanatti in Vanatti's office fall clearly under the terms of his parole agreement. In Paragraph 9(b) of the Parole Release Agreement, Scanland agreed that his "person and residence" were subject to reasonable search by DOC officials if the officials had "reasonable cause to believe" that Scanland had violated the terms of his parole. Ex. Vol., State's Ex. 1. At the police station, Scanland acted in a manner suggesting that he was under the influence of a controlled substance. The use of a controlled substance was in violation of the terms of both Paragraph 5(b) (prohibiting the use of controlled substances) and Paragraph 7 (forbidding illegal conduct) of the Parole Release Agreement.

---

[10] Scanland also argues that, during the search, he was asked by officers where his bedroom was. He claims that his answer directing the officers to his bedroom was the result of custodial interrogation and that the State relied upon his answer in establishing constructive possession of the drug pipes. We are not persuaded. Scanland had already volunteered that the drug pipes were in his home and where they were located inside his home. This alone was sufficient to establish his constructive possession of the pipes.

Scanland was thus *required* to submit to the urine screen, as it was a reasonable search of his person based on Agent Vanatti's reasonable belief that Scanland was under the influence of a controlled substance. When Scanland refused to submit to the drug screen, he also admitted that he would test positive for illicit drugs. Scanland's behavior, his refusal to submit to the urine screen, and his admission were sufficient to establish reasonable cause to search his home under the terms of the Parole Release Agreement. We therefore conclude that the search of Scanland's home for the drug pipes was proper under the terms of the Parole Relase Agreement, as well as under the rubric of non-custodial interrogation.[11] The trial court therefore did not abuse its discretion by admitting the pipes into evidence.

## Conclusion

[25] Scanland's statements to the parole agent that there were drug pipes in his home were made while Scanland was in custody, but he was not subject to custodial interrogation or the functional equivalent of interrogation. The failure to advise Scanland of his *Miranda* rights therefore did not render his statements inadmissible. Additionally, Scanland's statements to the parole agent that he had been using methamphetamine and that there were drug pipes in his home established reasonable cause to search his home under the terms of his parole release agreement. The trial court therefore did not err by admitting the pipes

---

[11] Because we conclude that the trial court did not err in the admission of the pipes or Scanland's statements, we need not address his argument that the admission of his statements and the pipes was not harmless error.

into to evidence. Because the trial court did not abuse its discretion in the admission of this evidence, we affirm the judgment of the trial court.

[26] Affirmed.

Vaidik, C.J., and Tavitas, J., concur.