**Joshua MAXWELL, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A05–0504–CR–233.

Court of Appeals of Indiana.

Dec. 30, 2005.

Transfer Denied March 9, 2006.

John Pinnow, Greenwood, for Appellant.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

MAY, Judge.

Joshua Maxwell appeals his convictions of murder,[1] confinement as a Class B felony,[2] arson as a Class B felony,[3] and theft as a Class D felony.[4] He raises one issue, which we restate as whether the trial court erred by admitting his confessions into evidence. We affirm.

## FACTS AND PROCEDURAL HISTORY

On September 10th, 11th, and 12th of 2000, Maxwell and his girlfriend, Tessie

1. Ind.Code § 35–42–1–1.

2. Ind.Code § 35–42–3–3.

3. Ind.Code § 35–43–1–1.

4. Ind.Code § 35–43–4–2.

McFarland, confined Robby Bott, stole property from Bott's residence, forced Bott to buy items for them at Meijer, killed Bott by shooting him in the face and strangling him, put him in the trunk of his own car, and set Bott and his car on fire. Maxwell and McFarland then fled to California.

On October 17, 2000, police in San Francisco attempted to conduct a routine traffic stop of Maxwell and McFarland because their car had run a red light. A vehicle chase ensued, shots were fired, and Maxwell eventually crashed the car. McFarland was shot, and Maxwell sustained a one-and-a-half by two inch abrasion on the side of his forehead. Inside their vehicle, police discovered a 9 mm firearm.

Police took Maxwell to the station. Inspector Kelly Carroll of the San Francisco Police Department informed Maxwell he would stay with Maxwell until the other inspectors arrived for an interview. Carroll offered Maxwell a soda or water. Paramedics treated the small abrasion on his Maxwell's face from the crash, and then they left. During the time they waited, Inspector Carroll and Maxwell had a short conversation, but Carroll did not question Maxwell regarding the alleged crimes.

Thereafter, Inspector Tony Camilleri of the San Francisco Police Department arrived and advised Maxwell of his *Miranda* rights. Maxwell did not appear intoxicated, and he appeared to understand his rights. Maxwell agreed to speak with the officers and gave a taped interview. In the interview Maxwell admitted purchasing merchandise with Bott's credit cards, stealing from Bott, confining Bott, shooting Bott in the head, killing Bott, and setting Bott's body on fire.

Less than two hours later, Maxwell gave a second videotaped confession to Inspector Casillas of the San Francisco Police

Department. This confession was essentially the same as the first.

Then, about two hours after the second confession, Maxwell discussed the case via speaker phone with Captain Joel Rush of the Speedway, Indiana, Police Department. Maxwell detailed the crimes he committed against Bott, and San Francisco police videotaped this confession as well.

The State charged Maxwell with murder, confinement, arson, and theft. Maxwell filed a motion to suppress the videotaped confessions, and the trial court denied that motion. At trial, the State offered as evidence the three videotapes of Maxwell confessing. Over Maxwell's objection, the court admitted the videotapes. The jury found Maxwell guilty as charged. The court sentenced Maxwell to sixty-five years for murder, three years for confinement, twenty years for arson, and three years for theft. It then ordered all those sentences served consecutively.

## DISCUSSION AND DECISION

The admission of evidence is left to the discretion of the trial court, and we reverse only for an abuse of that discretion. *See Packer v. State,* 800 N.E.2d 574, 578 (Ind.Ct.App.2003) (defendant's argument regarding denial of his motion to suppress more appropriately framed as error in admission of evidence at trial), *trans. denied* 812 N.E.2d 795 (Ind.2004). An abuse of discretion has occurred only if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

When a defendant challenges the admissibility of a confession, the State has the burden to prove beyond a reasonable doubt the statement was voluntarily given. *Fields v. State,* 679 N.E.2d 1315, 1320 (Ind.1997). Maxwell signed a waiver of rights form; however, a "signed waiver is

not conclusive evidence of a knowing, intelligent and voluntary waiver." *Houchin v. State,* 581 N.E.2d 1228, 1231 (Ind.1991) (*overruled on other grounds by Smith v. State,* 689 N.E.2d 1238 (Ind.1997)). Rather the trial court, and courts on appeal, must consider the totality of the circumstances surrounding the confession. *Fields,* 679 N.E.2d at 1320.

 "A court may not admit involuntarily given statements into evidence." *Id.* Rather, a court must safeguard a defendant's right not to confess due to " 'inducement, violence, threats or other improper influences' " that " 'overcome the free will of the accused.' " *Id.* (quoting *Collins v. State,* 509 N.E.2d 827, 830 (Ind.1987)).

 When we review a trial court's determination regarding the voluntariness of a statement, we must find "the determination clearly appears in the record." *Id.* We consider the evidence supporting the trial court's decision and "any unrefuted evidence in the defendant's favor." *Houchin,* 581 N.E.2d at 1231.

### A. *Missouri v. Seibert*

First, Maxwell analogizes his situation to that in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The Supreme Court summarized that case as follows:

> This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda v. Arizona,* 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] ... (1966), the interrogating officer follows it with *Miranda*

warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement. Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible.

*Id.* at 604, 124 S.Ct. 2601.

Maxwell acknowledges his situation is not exactly like *Seibert,* because Maxwell did not confess to committing the crime prior to the officers giving him his *Miranda* warnings. Nevertheless, he believes we should extend *Seibert* to cover situations where police have *any* conversation with a suspect without giving the *Miranda* warnings. Under the facts herein, we decline his invitation.

Not only did Maxwell not confess prior to being given his *Miranda* warnings, the record contains no suggestion any officer interrogated [5] Maxwell prior to giving him *Miranda* warnings. During the hearing on the motion to suppress, Inspector Carroll gave the following testimony regarding his time with Maxwell prior to *Miranda* warnings:

> Q. I'm sorry—inspector. And when that—before this taped statement began did you have conversation with Mr. Maxwell?
>
> A. Yes.
>
> Q. Okay. Was that then before he was formally advised of his Miranda warnings?
>
> A. Yes.
>
> Q. Okay. And in the conversation that you had with Mr. Maxwell before he

---

**5.** "Under *Miranda,* 'interrogation' includes express questioning and words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." *White v. State,* 772 N.E.2d 408, 412 (Ind.2002).

was given his Miranda warnings was he asked pertinent questions regarding the case—this case?

A. No.

Q. Okay. What was the substance of the conversation—the pre-Miranda warning conversation that you had with Mr. Maxwell?

A. I explained to Mr. Maxwell that essentially I would sit there and wait with him until another inspector—in this case Inspector Camilleri arrived at our location which was an interview room at 850 Bryant in room 450 of that building and I recall offering him a drink of some sort whether it was water or soda but essentially explained to him that I would be waiting there until another inspector relieved me to handle whatever further investigation was to be undertaken. Inspector Camilleri along with his partner Inspector Casillas that's C–A–S–I–L–L–A–S were the on call team that day. I did not have on call responsibilities and so essentially I was just holding down the fort as it were.

Q. Okay. So would it be correct for me to say that the pre-Miranda conversation that you had with Mr. Maxwell did not involve any questioning regarding the facts of this case?

A. That's absolutely correct.

(Tr. at 235–36.) The trial court's determination that Maxwell's confession was not involuntary for the reasons discussed in *Seibert* is supported by evidence that appears clearly in the record.

B. *Mincey v. Arizona*

■ Next, Maxwell claims his confessions were involuntary in the same way the confession was involuntary in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The facts in *Mincey* were these:

Mincey was brought to the hospital after the shooting and taken immediately to the emergency room where he was examined and treated. He had sustained a wound in his hip, resulting in damage to the sciatic nerve and partial paralysis of his right leg. Tubes were inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting; a catheter was inserted into his bladder. He received various drugs, and a device was attached to his arm so that he could be fed intravenously. He was then taken to the intensive care unit.

At about eight o'clock that evening, Detective Hust of the Tucson Police Department came to the intensive care unit to interrogate him. Mincey was unable to talk because of the tube in his mouth, and so he responded to Detective Hust's questions by writing answers on pieces of paper provided by the hospital. Hust told Mincey he was under arrest for the murder of a police officer, gave him the warnings required by *Miranda* . . . , and began to ask questions about the events that had taken place in Mincey's apartment a few hours earlier. Although Mincey asked repeatedly that the interrogation stop until he could get a lawyer, Hust continued to question him until almost midnight.

*Id.* at 396, 98 S.Ct. 2408 (footnote omitted). Around midnight, Mincey confessed. In holding the record clearly indicated Mincey's confession was not voluntarily, the Court noted:

It is hard to imagine a situation less conducive to the exercise of a rational intellect and a free will than Mincey's. He had been seriously wounded just a few hours earlier, and had arrived at the hospital depressed almost to the point of

coma, according to his attending physician. Although he had received some treatment, his condition at the time of Hust's interrogation was still sufficiently serious that he was in the intensive care unit. He complained to Hust that the pain in his leg was unbearable. He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, at the complete mercy of Detective Hust, unable to escape or resist the thrust of Hust's interrogation.

In this debilitated and helpless condition, Mincey clearly expressed his wish not to be interrogated. As soon as Hust's questions turned to the details of the afternoon's events, Mincey wrote: "This is all I can say without a lawyer." Hust nonetheless continued to question him, and a nurse who was present suggested it would be best if Mincey answered. Mincey gave unresponsive or uninformative answers to several more questions, and then said again that he did not want to talk without a lawyer. Hust ignored that request and another made immediately thereafter. Indeed, throughout the interrogation Mincey vainly asked Hust to desist. Moreover, he complained several times that he was confused or unable to think clearly, or that he could answer more accurately the next day. But despite Mincey's entreaties to be let alone, Hust ceased the interrogation only during intervals when Mincey lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task. The statements at issue were thus the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness.

*Id.* at 398–401, 98 S.Ct. 2408 (internal citations, quotations, and footnotes omitted).

Herein, Inspector Carroll testified as follows about Maxwell's physical condition:

Q. Okay. On this date and in particular at this time when you're sitting in the room with Mr. Maxwell he had just been arrested regarding I guess for lack of a better way of putting it a chase—a vehicular chase and some accidents and gunfire of things of that sort, is that correct?

A. That was my understanding, yes.

Q. Okay. Could you describe for me Mr. Maxwell's physical condition at the time that you were sitting in that room with him?

A. He appeared awake, alert, oriented to time and space. I noticed that he had a slight abrasion on his face. I can't recall which side but otherwise it was nothing outstanding or particular that I recall about his physical presentation.

Q. A slight abrasion on his face—

A. Uh-huh.

Q. —is the only physical abnormality you saw with Mr. Maxwell?

A. If you want to classify it as an abnormality but—

Q. Injury I guess?

A. Okay. A slight abrasion.

Q. Did it appear fresh?

A. Yes.

Q. Okay. Do you know if Mr. Maxwell received any medical treatment before you met with him at that time?

A. No, actually at the time—during that time that I met with him he was attended by paramedics.

Q. Okay. And you observed the paramedics attending to him?

A. Yes.

Q. And what did you observe them do?

A. Essentially irrigate that small abrasion on his face, ask the questions common in particular to paramedics regarding his orientation times four as they term it in terms of his understanding of where he was, who he was, time, place and he appeared to answer all those questions to their satisfaction such that after a few minutes of time with him they left.

Q. Okay. Now when you say a small abrasion what do you—how—what size abrasion are you referring to— if it helps to use perhaps money— like was it the size of a dime, a quarter, half dollar—bigger?

A. Well, actually, I wasn't thinking in terms of money but in terms of just physical size.

Q. Okay.

A. Approximately a one to one and a half inch by two inch abrasion.

Q. Okay. And what part of his face was that on?

A. As I said I don't recall exactly the side of his face but as I recall it was towards the temple/forehead area.

(Tr. at 238–40.)

Maxwell's situation does not compare to Mincey's situation, and so we decline to spend time distinguishing the cases. The record leaves us without any doubt that Maxwell's abrasion on his forehead did not render him "a seriously and painfully wounded man on the edge of consciousness." *Mincey*, 437 U.S. at 401, 98 S.Ct. 2408. The trial court did not err when it rejected this argument.

## CONCLUSION

The court did not err when it found Maxwell's confessions were voluntary, and therefore, it did not abuse its discretion when it admitted those confessions into evidence. Accordingly, we affirm.

Affirmed.

KIRSCH, C.J., and ROBB, J., concur.