## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 28 2017, 5:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark F. James
Anderson, Agostino & Keller P.C.
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Bruce Dewayne Thomas, III,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

June 28, 2017

Court of Appeals Case No.
71A03-1608-CR-1908

Appeal from the St. Joseph
Superior Court

The Honorable Jane Woodward
Miller, Judge

Trial Court Cause Nos.
71D01-1602-MR-1
71D01-1110-FB-166

**Brown, Judge.**

[1] Bruce Dewayne Thomas, III, appeals his conviction for murder. Thomas raises three issues which we consolidate and restate as:

    I.      Whether the trial court abused its discretion in admitting into evidence statements he made to a detective; and

    II.     Whether the court abused its discretion in not instructing the jury on the offenses of voluntary manslaughter and involuntary manslaughter.

We affirm.

## Facts and Procedural History

[2] Kayli Miller and her two children previously lived with Tyshawn Williams;[1] they stopped living with him two or three weeks prior to December 24, 2015, and moved into an apartment at the Miami Hills Apartments. Her brother, her brother's girlfriend Martrina Reid, the daughter of Miller's brother and Reid, Miller's mother, and Clevee Chick, who was the boyfriend of Miller's mother, were staying there as well. Miller did not tell Williams where she was staying, and he tried to communicate with her to find out where she was. On the evening of December 23, 2015, Miller received a text message from Williams stating that he was going to kill her. Also in December 2015, Thomas was in a relationship with Amanda Kleepsie, who had previously been in a relationship with Williams.

---

[1] At trial, Miller testified that Williams thought that both of the children were his but that he is the father of only the younger child.

[3] On the morning of December 24, 2015, Williams contacted Kleepsie and said he needed a ride to see his children, and she agreed to give him a ride. Kleepsie picked up Williams in her vehicle, drove to the Miami Hills Apartments, and parked in the parking lot. Williams stayed in the vehicle, and then Kleepsie pulled out of the lot and traveled north. As they were driving, they saw Thomas walking toward the Miami Hills Apartments, Kleepsie pulled over, Williams told Thomas that he might need his help, and Thomas entered the backseat of the vehicle. Kleepsie drove back to the Miami Hills Apartments and parked in the parking lot. Williams and Thomas stayed in the vehicle for approximately ten minutes. Williams and Thomas, both of whom carried guns under their hoodies, exited Kleepsie's vehicle, entered an apartment building, and walked up the steps to the third-floor apartment where Miller was located. At the time, Miller and her two children, Reid, the daughter of Reid and Miller's brother, Miller's mother, and Chick were among those inside.

[4] In response to a knock on the apartment door, Reid opened it to see Thomas and Williams both pointing guns at her, and she yelled "they've got guns." Transcript Volume II at 117. Chick ran to the door, Reid or Chick closed or slammed the door, Chick placed his back against the door so that Williams and Thomas could not enter the apartment, and "[a]s soon as it slammed . . . [t]he gunshots was already coming." *Id.* at 98. Chick was struck by two bullets, the first striking him in the back of the head and the second striking the back part of his shoulder, and he died as a result. The trajectories of four bullets which struck the apartment door show that the door was partially open when two

shots were fired through it from the hallway, and that the other two bullets were fired from the hallway through the door, which the crime scene investigator believed was shut at that point, and struck Chick. Kleepsie, who was in the car, heard three gunshots, a pause, and then three additional gunshots.

[5] Thomas and Williams exited the apartment building and walked to and entered Kleepsie's vehicle, and Kleepsie drove away from the apartment complex. Kleepsie noticed that Thomas was holding his hand and was bleeding and gave him one of her shirts to wrap his hand, and Thomas indicated that, although he did not know how, Williams had shot him. After dropping Williams off at a house, Kleepsie drove Thomas to his mother's house and, after less than fifteen minutes, drove him to an area a couple of blocks away from the Miami Hills Apartments, where Thomas exited the vehicle and spoke with his brother for five to ten minutes. Kleepsie then drove Thomas to her house and later drove him to the hospital. Kleepsie and Thomas indicated to a police officer at the hospital that they were cleaning guns and that Thomas's injury was an accident.

[6] On January 25, 2016, Detective Timothy Wiley and his partner went to the St. Joseph County Jail, where Thomas was being held on unrelated charges, and asked for Thomas to be brought down to the booking area. Detective Wiley asked Thomas if he was willing to talk in the interview room, and Thomas responded affirmatively. Detective Wiley noticed Thomas had a bandage on his finger and asked him what had happened, and Thomas "said he got shot." Transcript Volume III at 27. Detective Wiley asked Thomas "how it happened," "where it happened," and "where he sought medical treatment,"

and "[t]o all of those questions [Thomas] said he did not know." *Id.* At that point, Thomas asked if he could leave the interview room and stated he did not want to talk anymore, Detective Wiley "said okay," and Thomas stood up and walked out. Transcript Volume I at 33. Thomas was in the room with Detective Wiley for approximately three of four minutes. Detective Wiley later located and interviewed Kleepsie.

[7] On February 5, 2016, the State charged Thomas with murder under cause number 71D01-1602-MR-1 ("Cause No. MR-1"). Thomas moved to suppress his statements to Detective Wiley at the St. Joseph County Jail and argued he was in custody at the time he made his statements. The trial court noted that the interview was very short, Thomas left as soon as he said he wanted to leave, and he was not in restraints and there was no guard outside the door. The court found that Thomas had not been in custody for *Miranda* purposes and the interview was not a custodial interrogation under Ind. Trial Rule 617, and denied the motion to suppress. Thomas submitted proposed jury instructions on sudden heat, voluntary manslaughter, and involuntary manslaughter, which the trial court rejected. The jury found Thomas guilty of murder and was sentenced to fifty-five years. After sentencing Thomas under Cause No. MR-1, the court noted that he had received a suspended sentence under cause number 71D01-1110-FB-166 ("Cause No. 166"), took judicial notice of the verdict of the jury, found that Thomas violated his probation in that cause by committing a new criminal offense, and scheduled a sentencing hearing. At the subsequent sentencing hearing under Cause No. 166, the State argued that Thomas had

previously violated his probation in the case in 2012 and that there was not much of a worse way to fail on probation, and the court ordered that he serve his previously-suspended sentence of six years consecutive to his sentence for murder.

## *Discussion*

### I.

[8] The first issue is whether the trial court abused its discretion in admitting into evidence the statements Thomas made to Detective Wiley at the St. Joseph County Jail. The admission and exclusion of evidence is a matter within the sound discretion of the trial court, and we will review only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Oatts v. State*, 899 N.E.2d 714, 719 (Ind. Ct. App. 2009). Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied, trans. denied*.

[9] Thomas argues that, when Detective Wiley visited him in jail, no effort was made to read him his *Miranda* rights, the actions of the detective violated Ind. Evidence Rule 617, and the detective's testimony regarding the interview at the jail should have been excluded. He asserts he did not invite the interview, he was removed from his cell, and he was in a place of detention.

[10] The State responds that Thomas was not in custody, noting Detective Wiley asked Thomas if he would speak with him in an interview room, Thomas was not in any restraints, the interview room door was closed but not locked, the encounter lasted three or four minutes, and Thomas was permitted to leave the interview room when he asked to do so. The State also argues that Thomas's statement that he had been shot was cumulative of other evidence and thus that any error in admitting the statement was harmless.

[11] The police are required to advise a suspect of his *Miranda* rights only if the suspect is subjected to custodial interrogation, and accordingly *Miranda* warnings do not need to be given when the person questioned has not been placed in custody. *Hicks v. State*, 5 N.E.3d 424, 428-429 (Ind. Ct. App. 2014) (citing *Luna v. State*, 788 N.E.2d 832, 833 (Ind. 2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602 (1966))). In determining whether a person was in custody or deprived of freedom such that *Miranda* warnings are required, our ultimate inquiry is whether there is a formal arrest or a restraint of the freedom of movement of the degree associated with a formal arrest. *Id.* We make this determination by examining whether a reasonable person in similar circumstances would believe he is not free to leave. *Id.* We examine all the circumstances surrounding an interrogation, and are concerned with objective circumstances, not with the subjective views of the interrogating officers or the suspect. *Id.*

[12] Ind. Evidence Rule 617 provides in part that, "[i]n a felony criminal prosecution, evidence of a statement made by a person during a Custodial

Interrogation in a Place of Detention shall not be admitted against the person unless an Electronic Recording of the statement was made, preserved, and is available at trial . . . ."

[13] Imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*. *Howes v. Fields*, 565 U.S. 499, 511, 132 S. Ct. 1181, 1190 (2012). Taking a prisoner aside for questioning does not necessarily convert a noncustodial situation to one in which *Miranda* applies. *Id.* at 512, 132 S. Ct. at 1191. While taking a prisoner aside for questioning may necessitate some additional limitations on his freedom of movement, such procedures are an ordinary and familiar attribute of life behind bars, and escorts and special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine and taken to a special location. *Id.* at 513, 132 S. Ct. at 1192. When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. *Id.* at 514, 132 S. Ct. at 1192. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted. *Id.*

[14] The record reveals that Thomas was not taken into custody for purposes of *Miranda* or Ind. Trial Rule 617. Detective Wiley and his partner asked that he be brought down to the booking area of the St. Joseph County Jail. Detective Wiley testified that the booking area was a very large room, there were two or three large intake rooms off to the side, and then "off to the back, out of sight, around a corner, is an interview room." Transcript Volume I at 31. Detective

Wiley indicated that, when Thomas arrived, he was not in handcuffs or shackles and was wearing "jail greens," which based on his experience did not indicate any sort of special level of detention, protection, or segregation. *Id.* at 32. He further testified that, once Thomas arrived, he asked him "if he was willing to talk with us back in the interview room, and he said yes," and they walked around to the back interview room and sat down. *Id.* Detective Wiley stated that, once in the interview room, he "looked down at [Thomas's] finger and . . . said, well, what happened there? Or something along those lines," and Thomas "said he got shot in the finger." *Id.* at 33. When asked if he asked Thomas anything else, Detective Wiley responded:

> I asked him where it took place. He said he didn't remember. I asked him, I believe, what medical treatment or where he got medical treatment at. He said he didn't know, and then he said if he could leave the interview room, he didn't want to talk anymore. I said okay. Got up. He walked out. Free to go back to his cell.

*Id.* Detective Wiley indicated "that's how it concluded." *Id.* When asked "was he free to leave," Detective Wiley testified: "When he wanted to leave I got up, got out of the way, and he went back. So, yes, he was free to leave." *Id.* at 36. Detective Wiley indicated he did not have authorization to tell Thomas he could leave the custody of the jail but that "[h]e was certainly free to leave my presence." *Id.* at 37. Detective Wiley testified that the interview rooms are "around the corner away from the prying eyes of the other inmates." *Id.* at 43. He also indicated that the door to the interview room was unlocked and he did

not need to knock on the door to have someone let him out. When asked how long Thomas was in the room with him, Detective Wiley replied, "[c]onservatively, three or four minutes." *Id.* at 44.

[15] Taking into account all of the circumstances of the questioning, including that Thomas agreed to speak with the officers and left the interview room approximately three or four minutes later as soon as he indicated he did not wish to speak with them any longer, we conclude that Thomas was not in custody within the meaning of *Miranda* or Ind. Trial Rule 617. *See Howes*, 565 U.S. at 514-515, 132 S. Ct. at 1192-1193 (holding that the respondent was not taken into custody for purposes of *Miranda* and observing that, while the respondent did not invite the interview, was not advised that he was free to decline to speak with the deputies, and the interview lasted for hours, the respondent was told at the outset and reminded thereafter that he could leave, he was not physically restrained and was interviewed in an average-sized conference room, and although he had to wait twenty minutes to be escorted to his cell, he would have been subject to this restraint even if he had been taken to the conference room for some reason other than police questioning); Ind. Evidence Rule 617 (applicable to statements made by a person during a custodial interrogation). The trial court did not abuse its discretion in admitting Detective Wiley's testimony regarding his interview with Thomas at the jail.

[16] Moreover, any error in admitting Detective Wiley's testimony regarding Thomas's statement at the jail that he had been shot is harmless. Errors in the admission or exclusion of evidence are to be disregarded as harmless error

unless they affect the substantial rights of the party. *Lewis v. State*, 34 N.E.3d 240, 248 (Ind. 2015). To determine whether an error in the introduction of evidence affected the party's substantial rights, we assess the probable impact of that evidence upon the jury. *Id.* The jury in this case heard testimony from Kleepsie that, after Thomas exited the apartment building following the shooting, she observed that Thomas was holding his hand and was bleeding, she gave him one of her shirts to wrap his hand, and Thomas indicated that Williams had shot him. The jury also heard evidence that Kleepsie later drove Thomas to the hospital. Thomas's statement that he had been shot, following Detective Wiley's question regarding what had happened to his finger, is cumulative of other testimony presented to the jury. *See Johnson v. State*, 699 N.E.2d 746, 749 (Ind. Ct. App. 1998) (holding that the error in admitting a recording was harmless because the recording was cumulative of prior testimony).

## II.

[17] The next issue is whether the trial court abused its discretion in not giving Thomas's proposed instructions on voluntary manslaughter and involuntary manslaughter to the jury. Thomas argues that Williams was upset and had sent a threatening text message, that the evidence suggests the shots were fired when Williams saw the mother of his children and was refused entry to the apartment, and the act of being shut out of the apartment caused Williams to become more upset to the point of acting with sudden heat. He argues that "[Williams], and therefore, Thomas, as an abettor could not have been thinking

clearly to shoot into a room where, [Williams's] children were." Appellant's Brief at 9. With respect to his proposed instruction on involuntary manslaughter, Thomas argues, "[a]s stated above, the sudden heat is because the door was shut on [Williams] preventing him from seeing his children." *Id.*

[18] The State argues that no evidence was presented that Thomas was acting under sudden heat and therefore the trial court properly refused his proposed instruction on voluntary manslaughter. The State also argues that, in this case, involuntary manslaughter was not factually included in the charging information for murder, Thomas does not point to evidence that he intended only to commit a battery instead of a murder, and thus the trial court properly refused the proposed instruction on involuntary manslaughter.

[19] We apply a three-step analysis in determining whether a defendant was entitled to an instruction on a lesser-included offense. *See Wright v. State*, 658 N.E.2d 563, 566-567 (Ind. 1995). We must determine: (1) whether the lesser-included offense is inherently included in the crime charged; if not, (2) whether the lesser-included offense is factually included in the crime charged; and if either, (3) whether there is a serious evidentiary dispute whereby the jury could conclude the lesser offense was committed but not the greater offense. *Id.* If the "jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense." *Id.* at 567. When the trial court makes a finding that a serious evidentiary dispute does not

exist, we will review that finding for an abuse of discretion. *Brown v. State*, 703 N.E.2d 1010, 1019 (Ind. 1998).

[20] A person commits murder when the person "knowingly or intentionally kills another human being." Ind. Code § 35-42-1-1. A person commits voluntary manslaughter when the person knowingly or intentionally kills another human being "while acting under sudden heat." Ind. Code § 35-42-1-3(a). Sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. Ind. Code § 35-42-1-3(b). "Sudden heat occurs when a defendant is provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection." *Conner v. State*, 829 N.E.2d 21, 24 (Ind. 2005). "[N]either mere words nor anger, without more, provide sufficient provocation." *Id.* Also, sudden heat can be negated by a showing that a sufficient "cooling off period" elapsed between the provocation and the homicide. *Morrison v. State*, 588 N.E.2d 527, 531-532 (Ind. Ct. App. 1992).

[21] Voluntary manslaughter is inherently included in murder. *Horan v. State*, 682 N.E.2d 502, 507 (Ind. 1997), *reh'g denied*. A trial court should grant a requested voluntary manslaughter instruction if the evidence demonstrates a serious evidentiary dispute regarding the presence of sudden heat. *Powers v. State*, 696 N.E.2d 865, 868 (Ind. 1998).

[22] The evidence presented at trial reveals that, after Kleepsie and Williams exited the parking lot of the Miami Hills Apartments and traveled north, they saw Thomas walking toward the apartments, Kleepsie pulled over, Williams told Thomas that he might need his help, and Thomas entered the backseat of the vehicle. Kleepsie drove back to the Miami Hills Apartments and parked in the parking lot, and Williams and Thomas stayed in the vehicle for approximately ten minutes. Kleepsie testified that she could see that both Williams and Thomas had a gun. Also, Williams had sent a text message to Miller the previous evening stating that he was going to kill her. In discussing the proposed instructions, Thomas's counsel argued there was no evidence of a discussion of a plan to kill anybody, that in a minute or two the plan went from one to obtain Williams's visitation to an act of shooting, that Thomas was merely an accessory, and that Williams had been angry that Miller had been depriving him of visitation and living with another man. The State responded that there was not any evidence of sudden heat at all. The trial court agreed with the State and said that anger alone is not enough to justify sudden heat. To the extent Thomas or Williams was angry that Miller had deprived Williams of visitation or about their relationship, we note that anger without more does not provide sufficient provocation. *See Conner*, 829 N.E.2d at 24.

[23] Based upon the record, we conclude that there was no serious evidentiary dispute regarding whether Thomas committed the offense causing the death of Chick while acting in sudden heat. Accordingly, the trial court did not abuse its discretion in declining to give Thomas's proposed instruction on voluntary

manslaughter. *See Bryan v. State*, 450 N.E.2d 53, 63 (Ind. 1983) ("The threat by an ex-spouse to remove one's children to another state is not sufficient provocation to reduce a homicide to manslaughter."); *Collins v. State*, 873 N.E.2d 149, 159-160 (Ind. Ct. App. 2007) (observing that, while the defendant pointed to evidence indicating he was angry before he shot the victim, it is well settled that anger alone is not sufficient to support an instruction on sudden heat and there was no evidence the defendant was angry at the time of the shooting and holding that, in the absence of appreciable evidence of sudden heat, the trial court properly refused to instruct the jury on voluntary manslaughter), *trans. denied*.

[24] As for Thomas's proposed instruction on involuntary manslaughter, Ind. Code § 35-42-1-4 provided at the time of the offense that "[a] person who kills another human being while committing or attempting to commit (1) a Level 5 or Level 6 felony that inherently poses a risk of serious bodily injury; (2) a Class A misdemeanor that inherently poses a risk of serious bodily injury; or (3) battery; commits involuntary manslaughter, a Level 5 felony." To the extent Thomas argues on appeal that "the sudden heat is because the door was shut on [Williams] preventing him from seeing his children," Appellant's Brief at 9, we note that sudden heat does not relate to involuntary manslaughter. Thomas does not present a cogent argument on appeal regarding his proposed instruction on involuntary manslaughter and has thus waived his argument. *See Cooper v. State*, 854 N.E.2d 831, 834 n.1 (Ind. 2006) (holding that the defendant's contention was waived because it was "supported neither by cogent

argument nor citation to authority"); *Shane v. State*, 716 N.E.2d 391, 398 n.3 (Ind. 1999) (holding that the defendant waived argument on appeal by failing to develop a cogent argument). We note that, waiver notwithstanding, Thomas's counsel argued before the trial court, in discussing the proposed instructions, that Thomas and Williams were attempting to break into the apartment and that attempting to commit a home invasion when somebody is killed is involuntary manslaughter. The trial court noted it was difficult to discern the circumstances under which shooting through a closed door would support a verdict of battery and rejected Thomas's proposed instruction on involuntary manslaughter.

[25] The record reveals that both Thomas and Williams carried guns when they exited Kleepsie's vehicle, entered the apartment building, and walked up the steps to the third-floor apartment where Miller was located. In response to the knock on the apartment door, Reid opened the door and observed Thomas and Williams both pointing guns at her. As soon as Reid or Chick closed or slammed the door, "[t]he gunshots was already coming." Transcript Volume II at 98. Kleepsie heard three gunshots, a pause, and then three additional shots. Of the four shots fired from the hallway which penetrated the door, two struck Chick resulting in his death. There was no serious evidentiary dispute regarding whether Thomas intended to commit only battery or another offense referenced in Ind. Code § 35-42-1-4. Further, the charging information alleged that Thomas "did knowingly kill Clevee Chick." Appellant's Appendix Volume II at 3. Based on the record, even if Thomas had not waived the issue,

we cannot say that the trial court abused its discretion in declining to give his proposed instruction on involuntary manslaughter. *See Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012) (finding that there was no serious evidentiary dispute that the defendant, by shooting the victim serval times, intended to commit only a battery; observing that when one shoots another person multiple times at close range, a reasonable jury could infer that the shooter's intent was to kill, not batter, the victim; noting the charging information alleged the defendant knowingly or intentionally killed the victim; and holding that the trial court did not abuse its discretion by refusing to give the defendant's tendered instruction on involuntary manslaughter).

In addition, we note that Thomas states that he "acknowledges that a court may revoke probation for mere commission of a criminal offense during his probationary period" and that, "[i]f this Court finds that [his] conviction should be reversed, then the Court must reverse the revocation of his probation." Appellant's Brief at 10. We do not reverse Thomas's conviction for murder under Cause No. MR-1 and do not disturb the revocation of his probation under Cause No. 166.

## *Conclusion*

For the foregoing reasons, we affirm Thomas's conviction for murder and the revocation of his probation.

Affirmed.

May, J., and Pyle, J., concur.